**IN THE UNITED STATES DISTRICT COURT**
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| EVGUENI ROUDACHEVSKI, D.O. | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| V. | * | |
| | * | NO: 4:11CV00230  SWW |
| ALL-AMERICAN CARE CENTERS, | * | |
| INC.  d/b/a ALL-AMERICAN CARE | * | |
| OF LITTLE ROCK | * | |

**ORDER**

On March 1, 2011, Evgueni Roudachevski, D.O. ("Dr. Roudachevski") commenced this

action in state court against All-American Care Centers, Inc. ("All-American"), alleging that All-

American wrongfully terminated his patient privileges at a  residential nursing care facility.

Before the Court is Dr. Roudachevski's motion for a  preliminary injunction (docket entry #3),[1]

All-American's response in opposition (docket entry #10), and Dr. Roudachevski's reply (docket

entry #14).   After a hearing held March 23, 2011, the Court denied Dr. Roudachevski's motion.

This order augments and reaffirms the findings of fact and conclusions of law made from the

bench.[2]  Also before the Court is the issue of subject matter jurisdiction, which the Court raised

---

[1]Dr. Roudachevski presented his motion as one for a temporary restraining order and a preliminary injunction.  Because All American answered the complaint and received service of the motion for injunctive relief before the case was removed to federal court, the Court treats the motion as one for a preliminary injunction.

[2]Dr. Roudachevski is not required to prove his case at this point, and the findings of fact and conclusions of law made at the preliminary injunction hearing are not binding on the trier of fact.  *See Henderson v. Bodine Aluminum, Inc*., 70 F.3d 958, 962 (8th Cir. 1995)(citing *University*

*sua sponte*.  For reasons that follow, the Court finds that it has subject matter jurisdiction.

## Background

Dr.  Roudachevski, a doctor of osteopathic medicine, began treating patients at Parkview

Rehabilitation Center ("Parkview") in 2008.  All-American purchased Parkview in October

2009, and changed the facility's name to All-American Care of Little Rock ("AACLR").  Dr.

Roudachevski had been serving as Parkview's medical director, and All-American retained him

as medical director for AACLR.  A medical director retainer agreement entered by the parties on

October 1, 2009 provides for a one-year term and automatic renewal, but states that the

agreement may be terminated by either party upon thirty days written notice.

In January 2010, All-American exercised its right to terminate its retainer agreement with

Dr. Roudachevski.  However, Dr. Roudachevski continued to treat AACLR residents who did

not  transfer their care to the new medical director, Dr. Kahn.

Jerry L. Rhoads ("Rhoads"), the president and CEO of All-American, testified that when

All-American purchased Parkview, the nursing care facility was on the brink of failing, and he

was forced to terminate Medicare and Medicaid contracts because of regulatory deficiencies

inherited from Parkview.  Rhoads further testified that in an effort to comply with regulatory

requirements, All-American made extensive personnel changes.  Regarding the decision to

terminate Dr. Roudachevski's medical directorship, Rhoads testified that Dr. Roudachevski's

relationship with All-American "wasn't good" from the beginning.

In July 2010, All-American again retained Dr. Roudachevski to serve as medical director

---

*of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834 (1981).

for AACLR. According to Rhoads, Dr. Kahn was deported to Pakistan, and he had no choice but

to rehire Dr. Roudachevski. Like the first retainer agreement entered by the parties, the second

agreement provided for termination upon thirty days written notice.

By letter dated December 16, 2010, Rhoads notified Dr. Roudachevski that his medical

directorship would end in thirty days. The letter reads as follows:

> This letter is to notify you of our wish to terminate you[r] Medical Directorship
> effective in 30 days. We appreciate your covering for us until we were able to find
> a replacement. We also need to notify you of other changes in protocols:
>
> > 1) We want all decisions on the discharge of patients from out facility to be
> > approved by Nursing Administration, including those going to the ER. We
> > have upgraded the capabilities of our nursing staff to avoid unnecessary
> > hospitalization.[3]
> >
> > 2) We need you to attend our Utilization Review meetings on Fridays for
> > managing your patients.[4]
> >
> > 3) We need for Debbie to clear medication orders with our Nurse Case
> > Managers.[5]
> >
> > 4) We need for you to utilize an APN rather than [an] LPN for following up
> > on your patients.[6]

---

[3]Regarding protocol #1, Rhoads testified that Dr. Roudachevski did not have a "doctor-to-doctor" relationship with physicians who treated AACLR patients at local hospitals, which hampered AACLR's ability to provide proper care for patients readmitted after a hospital stay.

[4]Rhoads testified that utilization review meetings concern Medicare utilization and are held every week.

[5]Debbie Daniels is a licensed practical nurse (LPN) employed by Dr. Roudachevski. Catherine Adams, AACLR's director of nursing, testified that Dr. Roudachevski and Daniels failed to coordinate patient care with nurse case managers. She also testified that Dr. Roudachevski's patients would often return from an off-site facility with no documentation. Adams testified: "If we don't know what went on at that facility, we're not able to take care of whatever they went out for."

[6]Rhoads testified that he wanted Dr. Roudachevski to utilize an APN (advanced practice nurse) for follow up care because the type of patients admitted to AACLR need "more than an

5) We need for you to interact directly doctor to doctor for your patients going to the ER or admitting to the hospital.[7]

6) We need for you to attend our quality assurance, family council, and safety committee meetings.

Our business is changing from custodial care cases to pre acute and post acute with a focus on restorative programs that embrace rehabilitation, recuperation, and reintegration back into community based programs . . . this results in shorter stays and more discharges back into the community.[8]  If our practice is taking that direction, we welcome your continued participation in our Organization's holistic care for the elderly and disabled. We need to meet as soon as you are available to discuss the above.

After Dr. Roudachevski received the foregoing letter, he met with Rhoads.  According to Dr. Roudachevski, he told Rhoads that he could not delegate his responsibility to admit or discharge patients, but he would coordinate discharges and readmissions with AACLR.   As for the requirement that Dr. Roudachevski utilize an APN, Dr. Roudachevski recalls that he told Rhoads he would follow the policy only if it applied to all AACLR physicians.

On February 1, 2011, the parties entered an agreement installing Dr. Roudachevski as

---

LPN assisting the physician if he's not going to be there and doing the rounds and the orders." Catherine Adams, AACLR's director of nursing, testified that Dr. Roudachevski often relied on his LPN, Debbie Daniels, to make rounds on patients.  Adams testified that Daniels failed to perform complete patient assessments and depended on AACLR staff nurses to provide her information about the status of patients.  According to Adams, the physicians presently on staff at AACLR make rounds in person every day.  Daniels testified that Dr. Roudachevski made patient rounds once a week.

[7]*See infra* note 4.

[8]Rhoads testified that All-American aspires to have AACLR become part of an accountable care organization, a type of medical network anticipated to be formed as a result of the Patient Protection and Affordable Health Care Act.  Rhoads indicated that federal health care reform will require that hospitals and nursing facilities work together to provide continuity of care for patients and that AACLR would cease receiving referrals if it continued to readmit patients to emergency rooms without doctor-to-doctor involvement.

AACLR's director of geriatrics and infection control.[11]   Dr. Roudachevski also served on

AACLR's clinical board of advisors.  But by letter to Rhoads dated February 23, 2011, Dr.

Roudachevski resigned his board and director positions, stating as follows:

> I am writing this letter to inform you that I am resigning the position of Director of
> Geriatrics and Infection Control on your Clinical Board of Advisors effective 30
> days from today.  I am unable to serve in this capacity or to accept new admissions
> to your facility.  However, I will continue to provide medical care for all of my
> current patients as per the standards of medical care specified by the Arkansas State
> Medical Board.  In regards to all patient care[,] I will expect the following:
>
> 1.  All my patients will have access to medical services including but not limited to
> specialized wound care and any inpatient facilities deemed necessary to address their
> medical needs.
>
> 2.  I will personally initiate all patient referrals to other healthcare providers.  If you
> have any questions please feel free to contact my office.  Thank you for your
> attention to this matter.

Plf.'s Hearing Ex. #4(A).

Dr. Roudachevski testified  that he wrote the foregoing letter because he perceived a

conflict between his duty to serve his patients and his board and director positions at AACLR.

He explained that in January 2011, he received notice that a surgeon would provide wound care

services to AACLR residents, and he initially agreed to utilize those in-house services.

However, Dr. Roudachevski later determined that his patients required more specialized wound

care available at an outpatient clinic.   Dr. Roudachevski recalls that on February 22, 2011, the

day before he resigned his posts at AACLR, he met with Rhoads to address his concerns about

the need for outpatient wound care.  According to Roudachevski, Rhoads told him that such

services were too expensive and would come out of Rhoads' pocket.

---

[11]*See* Pl.'s Hearing Ex. #2.

Rhoads testified that Dr. Roudachevski made clear at the February 22 meeting that he would not follow All-American's policies and procedures, which prompted Rhoads to tell Dr. Roudachevski that his privileges at AACLR were terminated.

On February 24, 2011, Dr. Roudachevski received letter from Rhoads stating that his practice at AACLR was terminated, effective immediately.  The letter reads:

> This letter is to inform you of our decision to terminate your practice here effective today.  We have found replacements and are notifying our patients of such action. Following are the reasons that you no longer have privileges at [AACLR]:
>
> 1.  You have not cleared all decisions on discharge of patients from our facility with nursing administration, including those going to the ER.
>
> 2.  You have not attended our Utilization Review meetings on Friday for managing our Medicare patients.
>
> 3.  Debbie did not clear medication orders with our Nurse Case Managers.[12]
>
> 4.  You have not assigned an APN rather than an LPN for following up on our patients.
>
> 5.  You have not interacted directly doctor to doctor for our patients going to the ER or admission to the hospitals.
>
> 6.  You have not attended our quality assurance, family council, and safety committees.
>
> Our business is changing from custodial cases to pre acute and post acute care with a focus on restorative programs that embrace rehabilitation, recuperation and reintegration back into community based programs . . . this results in shorter stays and more discharges back to the community.  Your practice is not taking that direction and we have reassigned our patients to other attending physicians, effective immediately.

Dr. Roudachevski testified that upon receiving the letter, he called AACLR in an effort to

---

[12]Dr. Roudachevski testified that he agreed to inform nurse case managers about medication orders, but he was later informed by a nurse case manager that the "old policy" was still in effect.

postpone a final decision and "sort out some kind of arrangements," but AACLR's administrator,

Cathie Jones, informed him that the decision was final, and he had no right to appeal.  Dr.

Roudachevski then contacted the Arkansas Department of Long Term Care and the Arkansas

Medical Society and reported his termination.

It is undisputed that when All-American terminated Dr. Roudachevski's privileges at

AACLR, sixty-eight AACLR residents were under his care.  All-American presented testimony

that after Dr. Roudachevski's termination, it informed residents' guardians and family members

that Dr. Roudachevski no longer practiced at AACLR, that AACLR had three other physicians

they could choose from, and if they wanted to stay with Dr. Roudachevski, they could transfer to

another facility.[13]  Rhoads testified that family members and residents were also informed that

residents could see Dr. Roudachevski in his office, located away from AACLR; but there is no

evidence that such an option is realistically possible, and Dr. Roudachevski testified that he does

not see patients at his office.

In his verified complaint, Dr. Roudachevski states that since February 24, 2011, he has

been contacted by the families and guardians of several AACLR residents, who "indicated" that

they wanted him to continue caring for their family members and wards.  Compl., ¶ 35.

However, at the preliminary injunction hearing, Dr. Roudachevski testified only that he has

_____

[13]Debbie Daniels, Dr. Roudachevksi's nurse, testified that she telephoned family
members and guardians of AACLR residents before Dr. Roudachevski received the termination
letter dated February 24, 2011, and she informed them that she and Dr. Roudachevski would
continue to care for AACLR residents.  According to Daniels, she made the telephone calls
because family members and guardians had called her and expressed concern that Dr.
Roudachevski was discontinuing his practice at AACLR.  Dr. Roudachevski's office manager,
Laura Sanchez, testified that she handles phone communications, correspondence, scheduling,
and billing for Dr. Roudachevski and that she has not received communications from his former
AACLR patients.

"received contact from patients" and a copy of a letter addressed to AACLR, which reads as follows:

> Doctor [Roudachevski] has been treating my sister . . . since she has been a resident of All American Care.  I would like to request that Dr. [Roudachevski] be granted permission to continue treating my sister.

Plf.'s Hearing Ex. #19(Bates Stamp #098).  Cathie Jones, AACLR's administrator, testified that after she received the foregoing letter, she telephoned the sender, who ultimately decided to transfer his sister's care to an AACLR staff physician.

On March 1, 2011, Dr. Roudachevski commenced this action against All-American in state court, claiming  tortious interference with contract or business expectancy and violation of the Arkansas Deceptive Trade Practices Act ("ADTPA").   Dr. Roudachevski alleges that termination of his practice at AACLR has irreparably harmed his physician-patient relationships and that "irreparable harm . . . will continue unless and until abated, restrained, and enjoined by this Court."  Compl. ¶¶  61-62.  By way of relief, Dr. Roudachevski  seeks compensatory and punitive damages and attorney fees.   He also seeks preliminary and permanent injunctive relief restoring his privileges at AACLR.

## Subject Matter Jurisdiction

All-American asserts in the notice of removal that the Court has subject matter jurisdiction  pursuant to 28 U.S.C. § 1332 because the action is between citizens of two different states, and the amount in controversy exceeds $75,000.  Regarding the amount in controversy, Dr. Roudachevski alleges in his complaint that he has suffered actual damages of $5,000, and "if All-American's acts continue unabated, damages will be in excess of the amount in controversy required for federal jurisdiction."  Compl., ¶ 100.  In its notice of removal, All-American asserts

that the requisite amount in controversy is met because in addition to punitive damages and

attorney fees, Dr. Roudachevski seeks injunctive relief and  alleges that the value he places on

the rights he seeks to protect exceeds $75,000.

By order entered March 13, 2011 (docket entry #9), the Court raised the question of

subject matter jurisdiction *sua sponte* and requested that All-American provide additional

information regarding the amount in controversy.  As stated in the March 13 order, the Court

finds that the mere assertion that Dr. Roudachevski will eventually suffer more than $75,000 in

damages if All-American's acts continue unabated is too speculative to satisfy the jurisdictional

amount requirement.

Even where neither party questions jurisdiction, the Court has an independent obligation

to satisfy itself that federal subject matter jurisdiction exists.  A complaint that alleges the

jurisdictional amount in good faith will confer jurisdiction unless it appears "to a legal certainty

that the claim is really for less then the jurisdictional amount."  *St. Paul Mercury Indem. Co. v.*

*Red Cab Co.*, 303 U.S. 283, 289, 58 S. Ct. 586 (1938).  However, if the court questions whether

the alleged amount in controversy is legitimate, the defendant shoulders the burden to show, by a

preponderance of evidence, that "the claims originally asserted by [the plaintiff] could, that is

might, legally satisfy the amount in controversy requirement." *James Neff Kramper Family*

*Farm Partnership v. IBP, Inc*.  393 F.3d 828, 831 (8th Cir. 2005)(citing *Kopp v. Kopp*, 280 F.3d

883, 885 (8th Cir. 2002)).

In response to the Court's request for additional information, All-American states, among

other things, that Dr. Roudachevski also seeks compensatory damages and that confusion has

arisen because he framed his claim for money damages in terms of preliminary injunctive relief.

Under Arkansas law, a plaintiff is entitled to recover his actual damages for tortious interference with contract or business expectancy.  *See Benny M. Estes and Associates, Inc. v. Time Ins. Co.*, 980 F.2d 1228, 1233 (8th Cir. 1992).  Additionally, a plaintiff may recover actual damages for violation of the ADTPA, plus reasonable attorney's fees.  *See* Ark. Code Ann. § 4-88-113(f).

During the preliminary injunction hearing, Dr. Roudachevski presented evidence that he has lost $15,250 in total revenue due to the termination of his patient privileges at AACLR.[14] Additionally, he estimates that if his privileges had not been terminated, he would have earned an additional $79,305 within the next five-month period.  The estimates regarding Dr. Roudachevski's lost revenue are based on calculations performed by his office manager, using historical billing records.  Considering this evidence, along with the availability of a reasonable attorney's fee award under the ADTPA, the Court finds that the claims originally asserted Dr. Roudachevski could legally satisfy the amount in controversy requirement.  *See Kopp v. Kopp*, 280 F.3d 883, 885 (8th Cir. 2002)("The district court has subject matter jurisdiction in a diversity case when a fact finder could legally conclude, from the pleadings and proof adduced to the court before trial, that the damages that the plaintiff suffered are greater than $75,000.").  Accordingly, the Court finds that it has subject matter jurisdiction.

### Motion for a Preliminary Injunction

In deciding whether to grant a preliminary injunction under Fed. R. Civ. P. 65(a),  the

---

[14]Dr. Roudachevski presented no evidence regarding his expenses.

Court must consider (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other interested parties; (3) the probability that movant will succeed on the merits; and (4) the public interest. *See Dataphase Sys., Inc. v. C L Sys., Inc*., 640 F.2d 109, 114 (8th Cir.1981) (en banc). A preliminary injunction is an extraordinary remedy, and the party seeking injunctive relief bears the burden of proving all the *Dataphase* factors. *See Watkins Inc. v. Lewis,* 346 F.3d 841, 844 (8th Cir. 2003)(citing *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir.1987)).

*Threat of Irreparable Harm*

A movant for a preliminary injunction must show a threat of irreparable harm, and failure to do so is an independently sufficient ground upon which to deny a preliminary injunction. *See Watkins Inc*., 346 F.3d at 844(citing *Adam-Mellang v. Apartment Search, Inc*., 96 F.3d 297, 299 (8th Cir.1996)). The movant must show that the harm is of such imminence that there is a clear and present need for equitable relief, *see Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir.1996), and "merely hypothetical threats of future harm are insufficiently immediate to justify the granting of preliminary relief . . . ." *Coteau Properties Co. v. Department of Interior,* 53 F.3d 1466, 1484 (8th Cir. 1995)(citing *Columbia Transit Corp. v. Jones*, 572 F.2d 168, 173-74 (8th Cir.1978)).

In an effort to show the threat of irreparable harm, Dr. Roudachevski testified that disruption of his physician-patient relationships could result in "very different medical outcomes" that could harm his patients and their families. However, Dr. Roudachevski's speculation regarding medical outcomes that *could* occur does not warrant injunctive relief.

Dr. Roudachevski further testified that termination of his practice at AACLR has exposed

him to *possible* liability for malpractice and disciplinary measures for abandoning his patients. Dr. Roudachevski acknowledged, however, that he has not been sued by AACLR residents and that no grievances or complaints have been filed against him.

Dr. Roudachevski testified that he faces irreparable damage to his reputation and the *possible* discontinuation of his practice as a geriatric physician in this area. Dr. Roudachevski presented no evidence confirming damage to his reputation. Even assuming that the termination of Dr. Roudachevski's patient privileges will harm his reputation and practice, such injury can be remedied by a favorable judgment and money damages. The Court finds that Dr. Roudachevski has failed to show a threat of irreparable harm.

*Balance of Harms*

In balancing the hardships, the court must consider the balance between the harm to the movant and the injury that granting an injunction will inflict on other interested parties. Dr. Roudachevski seeks a preliminary injunction "directing All-American to allow him access to his patients who are also residents of [AACLR] and further directing All-American to take all actions necessary to restore Dr. Roudachevski and his patients to the status quo as of February 23, 2011." Docket entry #3, at 19.

"'The primary function of a preliminary injunction is to preserve status quo until, upon final hearing, a court may grant full effective relief.' " *Rathmann Group v. Tanenbaum*, 889 F.2d 787, 789-90 (8th Cir.1989)(quoting *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir.1984)). Here, in order to grant the relief requested, it would be necessary to disturb the status quo and require AACLR to undo acts completed before Dr. Roudachevski filed suit. Even assuming that such an undertaking is possible, it would create a risk of further disruption of

patient care and order at AACLR.   Catherine Adams, the director of nursing at AACLR,

testified that presently, every AACLR resident is receiving care from a physician and that

restoring Dr. Roudachevski's patient privileges would create chaos and turmoil.  The Court finds

that the chance of irreparable harm to Dr. Roudachevski absent an injunction is outweighed by

the likely injury to interested parties if an injunction is granted.

*Likelihood of Success on the Merits*

Having determined that the balance of equities does not favor Dr. Roudachevski, the

Court is not required to "draw a fine line between a mathematical probability and a substantial

possibility of success [on the merits]."  *Dataphase*, 640 F.2d at 113 (8th Cir. 1981).  Although

the Court cannot determine at this early stage the likelihood of success on the merits with any

degree of certainty, for the reasons that follow, the Court finds that Dr. Roudachevski has failed

to show that the balance of equities, which lies with All-American, is offset by a  likelihood that

he will succeed on the merits.

The underlying premise of tortious interference with contract or business expectancy is

that a person has a right to pursue valid contractual and business expectancies unmolested by the

wrongful and officious intermeddling of a third party.  *See United Bilt Homes v. Sampson*, 310

Ark. 47, 832 S.W.2d 502 (1992).  As stated from the bench at the conclusion of the preliminary

injunction hearing, it is questionable whether, under the facts presented thus far, All-American is

properly classified as an intermeddling third party. It is undisputed that Dr. Roudachevski's

relationships with AACLR residents derived solely from his practice at AACLR.  *Compare*

*Baptist Health v. Murphy*, 2010 Ark. 358, --- S.W.3d ----, ----, 2010 WL 3835844 (2010)("While

the appellees often treat their patients at Baptist facilities, Baptist is not a party to those contracts

or business expectancies under Arkansas law for purposes of tortious interference.").

Even assuming that the interconnected relationship among All-American, Dr. Roudachevski, and AACLR residents does not preclude a tortious interference claim, the Court finds that Dr. Roudachevski has failed to show that he is likely to succeed on the merits. Arkansas law[15] requires that Dr. Roudachevski show, among other things, that All-American's conduct was improper.  *See Baptist Health v. Murphy*, 365 Ark. 115, 122, 226 S.W.3d 800, 807 (2006).  In determining whether a an actor's conduct is improper, factors to consider include: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of the actor and the contractual interests of the other; (6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relations between the parties.  *See Baptist Health v. Murphy,* 365 Ark. 115, 125, 226 S.W.3d 800, 809 (2006).

Dr. Roudachevski maintains that All-American terminated his privileges without justification or lawful motivation.  He contends that All-American ended his practice at AACLR because he refused to compromise patient care for the economic benefit of All-American.  All-American, on the other hand, contends that it terminated Dr. Roudachevski because he refused to follow legitimate policies and procedures aimed at providing quality care for AACLR residents.[16]  Even if financial considerations played a role in All-American's decision to

---

[15]Because subject matter jurisdiction in this case depends upon diversity of citizenship, the Court is required to apply state substantive law.  Here, there is no indication that a choice of law analysis is necessary as all events at issue took place in Arkansas.

[16]AACLR's current medical director, Ahmed Abdelal, testified all nursing care facilities have policies and procedures that staff physicians are required to follow.

terminate Dr. Roudachevski's privileges, it does not necessarily follow that All-American acted improperly.

Dr. Roudachevski also argues that termination of his patient privileges was improper because it violated his patients' right to a physician of their choice. However, a patient's right to choose a physician does not trump All-American's ability to require physicians to comply with legitimate policies. *See Baptist Health v. Murphy*, 365 Ark. 115, 127, 226 S.W.3d 800, 810 (2006)("We agree with Baptist's contention that . . . a patient may choose his or her physician, provided that the physician is in compliance with the hospital board's policies, has been appointed to the medical staff, and is credentialed to admit a patient and provide specified services.").

Finally, citing *Baptist Health v. Murphy*, 2010 Ark. 358, --- S.W.3d ----, ----, 2010 WL 3835844 (2010) and *Baptist Health v. Murphy*, 365 Ark. 115, 226 S.W.3d 800 (2006), Dr. Roudachevski asserts that conduct that interferes with or disrupts the patient-physician relationship is tortious, unconscionable, and contrary to settled public policy.

In *Murphy*, cardiologists sought to enjoin the implementation of an economic credentialing policy that would terminate their staff appointments and clinical privileges at Baptist Health hospitals solely on the basis of their ownership interests in a competing hospital. Many of the plaintiffs' patients were covered under insurance policies or benefit plans that had exclusive contracts for treatment only at Baptist Health facilities. *See Murphy*, 365 Ark. at 124, 226 S.W.3d at 808. Thus, if the plaintiffs lost privileges at Baptist on the basis of an economic credentialing policy aimed at suppressing competition and discouraging speciality hospitals, they would be forced to either divest themselves of ownership interests in other hospitals or have their

relationships with patients disrupted or terminated.   The plaintiffs in *Murphy* adduced evidence

that Baptist Health devised the economic credentialing policy for the purpose of disrupting long-

term, pre-existing relationships between the plaintiffs and their patients.  *See Murphy*, 365 Ark.

at 124, 226 S.W.3d at 808.   Under those facts, which are not present in this case, the Arkansas

Supreme Court upheld the trial court's finding that Baptist's conduct was unconscionable and

therefore satisfied the impropriety requirement for a claim of tortious interference.

        As for Dr. Roudachevski's claim under the ADTPA, the Supreme Court of Arkansas has

held that "the plain language of the ADTPA does not provide for a private action seeking

injunctive relief."  *See Baptist Health v. Murphy* (*Murphy III*), 2010 Ark. 358, —, —  S.W.3d

—, —  2010 WL 3835844 (2010).   Although Rule 65(a) provides the standard for issuing a

preliminary injunction to maintain the status quo, state law governs whether a cause of action

can support permanent injunctive relief.  Here, Dr. Roudachevski seeks a preliminary injunction

that goes well beyond maintaining the status quo.  *See* Charles Alan Wright, Arthur Miller &

Mary Kay Kane, Federal Practice and Procedure § 2943 (2d. ed. 1995)(explaining that granting

preliminary or injunctive relief under Federal Rule of Civil Procedure 65(a) does not impair state

interests when the effect is not final and does not permanently proscribe a defendant's freedom of

action).  Even assuming that the ADTPA does not preclude preliminary injunctive relief under

these circumstances, the Court finds that Dr. Roudachevski has failed to show a likelihood of

success on the merits with respect to his ADTPA claim.

        *Public Interest*

        A determination of where the public interest lies is not possible at this juncture.

Although preservation of the physician-patient relationship is a profoundly important public

interest,  public policy also favors All-American's ability to enforce legitimate rules and policies.

The Court is unable to find, on the current record, that the public interest would be served by

forcing the reinstatement of Dr. Roudachevski's privileges.

IT IS THEREFORE ORDERED that Plaintiff's motion for a preliminary injunction

(docket entry #3) is DENIED.

IT IS SO ORDERED THIS 31ST   DAY OF MARCH, 2011.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE